OPINION OF THE COURT
Richard B. Meyer, S.
Petitions by the maternal aunt and the father of a developmentally disabled adult in which each seeks to be appointed as the successor guardian of the person of the ward pursuant to SCPA article 17-A. Following a court-ordered evaluation of the parties and the ward conducted by Dr. Joseph E. Hasazi, a psychologist, a trial was held over the course of four days. In addition to hearing testimony from the parties, Hasazi and 16 nonparty witnesses, plus receiving numerous exhibits into evidence, the court conducted in camera conferences with the ward and the guardian ad litem. Written closing arguments were submitted and the same have been considered along with all of the evidence presented. This court has evaluated the credibility of the witnesses based upon their demeanor, the manner in which they testified, and the consistency, accuracy and probability or improbability of their testimony in light of all other evidence. The relevant facts found by the court are set forth in part I below.
L
The ward is a 33-year-old man who is developmentally disabled from traumatic brain injuries sustained in a tragic and horrific motor vehicle accident in August 1991. A tractor-trailer failed to stop for a red light at an intersection in the town of Chesterfield, Essex County, and struck the minivan being operated by his father. The ward was a passenger in the minivan as were his two sisters, who died from their injuries, his mother, who was severely injured, and his two cousins who were also injured. The ward and his mother received extensive medical treatment in Burlington, Vermont, and then were transferred to the Albany, New York area where they underwent a long course of rehabilitation. During this period of time, the father continued to work in order to financially support his son and the mother, and regularly traveled to Albany to be with them when he was not working. Ultimately, both the ward and the mother returned to the family home in Keeseville, New York. Initially, the father was the primary caregiver to his son while the mother continued to convalesce to the point that she could care for the ward, and all the while the father continued to *777 work to support the family. The tragedy continued to unfold as the father and mother became estranged and the mother began a relationship with R.B., who had provided special education services to the ward while in the Albany area.
The father suffered from post-traumatic stress disorder after the accident, which was not helped by the disintegration of his marriage. The mother and most of her family developed bitter and resentful feelings towards him and he was ostracized. The mother severed her relationship with the father in 1993 by having a friend deliver a note from her telling him, according to the testimony, to go to his family and she would go to her family. On the ward’s birthday that year she handed her wedding and engagement rings to the father. The mother also wrote a letter to her first cousin telling him to choose between being part of the family or remaining friends with the father. Those same feelings toward the father were on display at trial both in the demeanor of family witnesses and in the testimony of other witnesses. Initially, the mother moved out of the family home, taking the ward with her. Recognizing that it was in the best interest of his son that he remain in the family home, the father moved out so that his son could remain there with the mother. The ward stayed with the mother during the week and lived with his father on the weekends. The parents divorced in 1994, and one year later the mother married R.B.
The father continued to work for some period of time and was unsuccessful in transferring to a job in Florida. He eventually moved to Florida and became disabled from work. He married his current wife in 1997, and the ward attended the ceremony. In 1999, with the father’s consent, the mother was appointed guardian of the person of their then adult son. Thereafter, the mother did not foster the ward’s relationship with the father. The father has maintained regular telephone contact with his son, communicating by phone two to three times per day since 1994, and has also communicated by facsimile transmission, mail and email. After the father moved to Florida, his visitations with the ward were sporadic and, according to the father’s unrefuted testimony, difficult to arrange due to the mother’s interference. She also did not keep him timely advised of important events such as the ward’s medical conditions, treatment, or hospitalizations. The father learned of his son’s hospitalizations from other people, always well after the fact. On one occasion when the father wished to visit his son during the Christmas holidays, the mother told him he was not in the *778 picture anymore and that he was not welcome. When visiting his son in Keeseville, the father had to make the arrangements directly with his son. In the past few years, he has remained in the Keeseville area for approximately five months per year so that he could spend time with his son. He has had visitation on weekends while staying at the home of the mother’s cousin.
In February 2012, the father learned from the mother’s cousin that the mother was ill. He was unable to get any further information from the mother or other members of her family. In May of that year, the aunt informed him that she was going to apply for appointment as the ward’s guardian. She told the father that the mother asked her to be the guardian and that she wanted to fulfill the mother’s wishes. She filed her petition on June 19, 2012 and the father filed his own petition on August 9, 2012. The mother passed away on August 12, 2012.
Since his mother’s death, the ward has continued to reside with R.B., not his aunt, in the same home that he lived in with his mother. He has never resided with his aunt, but he did see her two or three times per week before his mother became fatally ill. She now sees him more often but almost always at R.B.’s home. The aunt has also taken the ward to medical appointments, as has the father. The ward has a very close, loving relationship with his 14-year-old half sister and R.B., the latter clearly being a second father to the ward. He also has a 19-year-old half brother with whom the ward is not close. While the ward loves his aunt, his love and affection for his father is clearly much greater and there is a deep, emotional bond between them that does not exist between the ward and the aunt. This was apparent throughout the course of the trial. A particularly heartwarming moment occurred after the father finished testifying and was walking back to his counsel’s table from the witness stand. The ward got out of his chair, walked over to his father and hugged him.
At R.B.’s home, the ward is provided with a very structured environment and schedule. Because of his traumatic brain injury, the ward lost his ability to recognize when he is thirsty and he must drink 100 ounces of fluid each day to insure that he does not get dehydrated. He gets verbal prompts for drinks, but sometimes he does it without prompts, particularly with meals. He wakes up between 6:00 and 7:00 a.m., takes his morning medications, pours himself a drink, and has a light breakfast. He gets himself dressed and may go for walk around the neighborhood. The ward might instead play video games, use *779 the computer, or go back to sleep. When R.B. gets up, the ward will get the newspaper, and might go for another walk. He drinks two 16-ounce glasses of water under supervision and then goes to the Traumatic Brain Injury (TBI) Center at the SUNY Plattsburgh campus, arriving by 10:00 a.m. The ward eats lunch at the TBI Center and has a 16-ounce drink. He generally returns home between 1:00 and 3:00 p.m., except on the one day each week when he works at a Super Shoes store in Plattsburgh for four hours. Transportation to and from the TBI Center is provided by his aunt, his father (when he is not in Florida), his maternal grandmother, and his cousin.
When the ward arrives home, he has a drink at 3:30 p.m. Weather permitting, he may go for another walk, play basketball with his half sister in the driveway, or throw a softball around. He often visits friends in the neighborhood, or plays with the children who live across the street. Later he has dinner with R.B. and his half-siblings, and he has another 16-ounce drink. After dinner, he may take a walk around the block, throw the ball around with his half sister and R.B., watch TV¡ use the computer, or take a nap. The ward showers at 8:30 p.m. and then plays Yahtzee or UNO with his half sister and R.B. His aunt often places his medications into a pill organizer so that he can take them as prescribed. The ward also performs chores around the home, including garbage and recyclables sorting, laundry, and house cleaning. Keeping the ward on a consistent schedule helps him to remember to drink fluids and take his medications at the proper time of the day. R.B. and the ward have developed a calendar and written reminder system to help the ward follow his daily schedule and routine.
The TBI Center in Plattsburgh offers no therapeutic or rehabilitative services for the ward’s traumatic brain injury, and its programming is limited primarily to providing a social setting for persons with a variety of developmental disabilities. The turnover of staff is significant, and the ward has not developed any significant interpersonal relationships with either staff or other attendees. In Florida, near the father’s home, there is a learning center for persons with developmental disabilities equipped with a library, weight room, and computer room. It has other facilities where attendees can receive instruction in traditional academic subjects. There is a kitchenette where cooking lessons are given. Attendees can participate in Special Olympics activities, and there are outings to professional sporting events, visits at homes for the elderly, and trips *780 to places such as restaurants where they are taught how to behave, how to pay their own bill, and to be responsible patrons.
The father’s home in Florida has three bedrooms and three bathrooms, plus a game room, pool table, and an enclosed swimming pool. The ward would be the only person living there in addition to the father and his wife. R.B.’s home in Keeseville has four bedrooms and the ward’s bedroom is above the garage. R.B.’s son lives in the half-finished basement and his daughter has her own bedroom. The house has a front porch, rear deck and an outdoor in-ground pool.
Both the aunt and the father have the mental stability, character, and ability to function adequately as guardian of the ward, and the father’s post-traumatic stress disorder does not adversely affect his ability to serve as guardian.
II
“[T]he court is authorized to appoint a guardian of the person or of the property or of both if such appointment of a guardian or guardians is in the best interest of the developmentally disabled person.” (SCPA 1750-a [1].) This best interest analysis applies whether the determination to be made is to appoint an initial or successor guardian.
As to whom should be appointed guardian, “it has long been the rule that strangers will not be appointed as [guardian] of the person or property of the incompetent, unless it is impossible to find within the family circle, or their nominees, one who is qualified to serve.” (Matter of Dietz, 247 App Div 366, 367 [1st Dept 1936].) Based upon various provisions of SCPA articles 17 and 17-A, and the circumstances of this case, the status of the aunt is that of a stranger rather than a member of the “family circle.” A petition for guardianship must contain the names and addresses of certain family members of the developmentally disabled person — parents, children, adult siblings, spouse, primary care physician and distributees (SCPA 1752 [3]) — and state why a living “parent, spouse or adult child . . . should not be appointed guardian” (SCPA 1752 [5]). An aunt is not a distributee of a developmentally disabled person unless such person, at the time of his or her death, has no living parent, spouse or issue and there are no living issue of such person’s parents (see EPTL 4-1.1 [a]; Matter of Lueke, 78 Misc 2d 904, 906 [1974], affd 49 AD2d 698 [4th Dept 1975] [“The law is well established that for purposes of intestate succession the only persons who can be deemed distributees of the deceased are *781 those who qualify as such at the date of the death of decedent”]). The clear legislative intent of these statutory provisions is to preclude an aunt from the “family circle” unless she is a distributee, a circumstance not present here since the ward’s father is alive and seeks to be appointed guardian.
Moreover, despite the aunt’s testimony that the mother asked her to be the ward’s guardian, there was no evidence that the mother so nominated her. The aunt’s petition for appointment was filed almost two months prior to the mother’s death and there was no evidence presented showing that the mother was then incompetent or otherwise unable to execute the petition for the aunt’s appointment, or some other document nominating the aunt, as successor guardian. Also, the mother in her will, executed on April 19, 2012 at a time when she knew the terminal nature of her illness, specifically excluded the ward therefrom and made no expression of her wishes relative to his guardianship.
Even assuming that the aunt is part of the “family circle,” it appears that the father has a right superior to that of the aunt to appointment as guardian absent evidence that his appointment is not in the ward’s best interest. Admittedly, when the choice of a guardian is between family members there is scant, definitive case law relative to whether a rebuttable presumption, or even a preference, exists in favor of the appointment of a parent over a non-parent. However, in the unreported case of Matter of Boni P.G. (13 Misc 3d 1235[A], 2006 NY Slip Op 52132[U], *2 [Sur Ct, Bronx County 2006]) the court noted that
“the provisions set forth in Article 17 of the SCPA, governing guardianship proceedings for infants, shall apply to SCPA Article 17-A guardianship proceedings for mentally retarded or developmentally disabled persons (SCPA 1761). The presumption that it is in the best interests of infants that their parents prevail in a contest with a non-parent in a guardianship, custody or similar proceeding may be overcome only where the non-parent establishes extraordinary circumstances (Matter of Bennett v Jeffreys, 40 NY2d 543 [1976]; Matter of Bock, 280 NY 349 [1939]; Matter of Stuart, 280 NY 245 [1939]. Considering that SCPA Article 17-A incorporates all of the SCPA Article 17 provisions that are relevant (SCPA 1761), and, also, as a matter of common sense, the presumption favoring the parent in infant guardianship proceedings is also applicable to *782 SCPA Article 17-A guardianship proceedings where the respondent is an adult.” (Id.)
Other provisions of SCPA articles 17 and 17-A bolster this analysis and conclusion. SCPA 1751 lists “a parent” first as a person who can petition for appointment and, as indicated above, there are specific pleading requirements when a parent of the ward is alive including that reasons be alleged setting forth why a parent should not be appointed guardian (see also SCPA 1704 [2], [7]). Upon the filing of a petition, process is required to be issued to a parent of the ward, but not to an aunt (SCPA 1705 [1]; 1753 [1]), and there is no requirement that notice of the petition be served by certified mail upon an aunt unless the court deems such to be proper (SCPA 1753 [2]). A hearing on the petition can be dispensed with if the parents consent to the appointment of a guardian (SCPA 1754 [1]), and a parent has the right to object to health care decisions made by a duly appointed guardian (SCPA 1750-b [5] [a] [ii]; 1750-a [2]). An aunt has no such rights.
Finally, since the legislature clearly expressed an intent that the laws applicable to infant guardianship proceedings apply to those involving developmentally disabled adults “[t]o the extent that the context thereof shall admit” (SCPA 1761), and because in an infant guardianship proceeding under SCPA article 17 “a biological parent has a right to the care and custody of his or her child, superior to that of all others, unless such parent has abandoned that right or has been proven to be unfit (see Matter of Michael B., 80 NY2d 299, 309)” (Matter of Autumn B., 299 AD2d 758, 759 [3d Dept 2002]), a biological parent has a right to guardianship of his or her developmentally disabled adult son or daughter superior to that of all others, subject to such appointment being in the best interests of the ward (SCPA 1750-a [1]).
m.
Despite his developmental and physical disabilities, the ward is an intelligent individual who seeks new experiences and opportunities to grow, develop and improve. His remarkable rehabilitation from the extensive injuries he received in the 1991 accident is testament to his drive and determination to live his life as though the accident never occurred. Though relatively happy, he is not satisfied with the status quo and is at times frustrated by it. The ward desires to experience more from life than spending five days per week at a TBI center that has a *783 constant turnover in staff and no programs or services beyond those promoting socialization. It would be a mistake, and not in the ward’s best interests, to limit him to his current regimen and living arrangements. Absent some credible evidence that a prolonged stay with the father in Florida, where he would receive more robust and stimulating therapeutic and rehabilitative services and experience minor changes to his day-to-day routine or activities, would be detrimental to or not in the best interests of the ward — and there was none here — there is simply no reason or justification to relegate the ward to the same limited experiences that have dominated his adult life. The ward’s daily routine from waking up to bedtime can be replicated in Florida and maintained consistently whether he is in Florida or New York. His physician testified that there was nothing about her care and treatment of the ward that would prevent his receiving equivalent care from physicians in Florida or the sharing of records and information between her and those doctors.
There was no evidence demonstrating that the father abandoned his son or is otherwise unfit or incapable of serving as the ward’s guardian and making decisions in the best interests of the ward. Although the evidence established that the father did not spend birthdays (his or the ward’s) or most of the Thanksgiving and Christmas holidays with the ward when he lived with the mother, there was no evidence that the aunt did so to any significant degree or regularity. With the loss of his mother, the ward’s emotional need for a parent’s love, guidance and attention is great and he is frustrated without it. Between the aunt and the father, only the father is capable of filling that need.
The evidence did not show that the aunt was better able to act in the ward’s best interests. Her primary reason for seeking guardianship was to fulfill her sister’s wishes, a statement she made more than once at trial, not because she was in the best position to promote or insure the ward’s best interests. Her plan, were she to prevail here, is that the ward reside with R.B., who would essentially serve as the de facto guardian. Her claims that the father was uninvolved in, and uninformed about, the ward’s physical, mental and emotional conditions as well as his care and needs, were not proved by the credible evidence. Rather, the evidence demonstrated that the father maintained as consistent and significant a parental role in his son’s life as possible considering both the extensive animosity towards him *784 by certain members of the late mother’s family and his own personal behavioral health issues arising out of the tragic 1991 accident. The familial animus towards the father was clearly evident to this day from the demeanor of certain family witnesses during their testimony at trial. Moreover, the undisputed evidence established that the mother limited the father’s contact and relationship with the ward. She, along with some members of her family, also withheld significant information about the ward’s care and development, as well as hospitalizations, from the father to a considerable degree, and the father was forced to rely upon other family members to keep him informed. The apparent secrecy practiced by the mother and those siding with her to keep information about the ward, and about the mother’s terminal condition, from the father is troubling. It also raises a concern that the father would continue to be relegated to the sidelines of the ward’s life if the aunt were to be appointed guardian, particularly since she did not articulate a reasonable plan for the ward’s contact with the father and the promotion of their relationship.
IV
For the foregoing reasons, the best interests of the ward lie in the father being appointed successor guardian under the conditions set forth below. The father’s petition is granted, and a decree and letters of guardianship shall issue. The aunt’s petition is denied. While it would be in the ward’s best interests that a standby guardian be appointed, no such application has been made (SCPA 1757).
The legal residence and domicile of the ward shall remain in the counties of Clinton or Essex of New York State. By providing a significant, continuous period of residency with R.B., the ward will be able to maintain his close relationships with his half-sister and R.B., and his relationships with other family and community members in the Keeseville, New York area. He shall have visitation with R.B. from June through December 22 or the last ecumenical choir performance, whichever is later, each year, during which time R.B. shall receive the stipend heretofore provided by the ward’s trust. During such visitation, the ward shall substantially resume and maintain his schedule of activities and services that he currently enjoys, including but not limited to the ecumenical choir. The father shall have regular visitation with the ward during this period, either in the Keeseville, New York area or in Florida. If the father’s visita *785 tion is to take place in Florida, then the same shall be limited to not more than one week each month.
The ward may relocate temporarily each year to the father’s home in Florida, or to such other living arrangement as is in the best interests of the ward, from after December 22 until the following June when he shall then return to visit R.B. During this period, the ward may have visitation with his half sister and R.B. in Florida. The exact dates and months when the visitation with R.B. shall begin and end may be modified by agreement between R.B. and the father. Any disputes between the father and R.B. shall be resolved by this court upon proper application by either party.
Whether at R.B.’s home or the father’s, the ward shall maintain a consistent, appropriate daily routine, subject to the schedule of his daily activities, programs and services. This includes a schedule of fluid intake, administration of his medications, personal hygiene, and the use of a calendar and written reminders.
This court retains exclusive jurisdiction over the ward and over all matters affecting this guardianship (SCPA 1758; Matter of Kevin Z. [Carmella AA. — Edward Z.], 105 AD3d 1269, 1271-1272 [2013]). The father shall file duly acknowledged initial and annual reports as guardian of the person with the Clerk of this court. The initial report is due within six months of the date letters are issued. In each report, the father shall:
a. address the ward’s medical and behavioral health condition (identifying the medical or other reports on which such report is based) and any changes in his care since the date of his appointment or the last report, as is applicable; and
b. identify the ward’s daily activities, including the frequency of his attendance and participation at therapeutic programs; and
c. lay out any proposed plan to change or modify the ward’s living arrangements, daily activities or care, visitation with his half-sister and R.B., and the reason(s) for such proposed change(s).
R.B. shall be paid the stipend from the ward’s trust for the period of time that this proceeding has been pending and during which the ward resided with him.